ORFINGER, Judge.
In this will contest the trial court revoked probate of decedent’s will of January 23, 1980, and the beneficiary of that will appeals. The revocation was based on a finding that the decedent lacked testamentary capacity and that appellant exercised undue influence upon decedent in the procurement of the will.
Appellant presents two issues on appeal; (1) Whether the evidence sustained the trial court’s findings that decedent lacked testamentary capacity during January, 1980; and (2) whether the trial court erred in deciding the ease with the burden of proof on appellant, because the court did not recognize the dissipation of the presumption of undue influence which had arisen against appellant.
The trial judge’s detailed findings of fact and conclusions of law have greatly expedited our review of this case and we recite them in full.
FINDINGS OF FACT
1. On July 23, 1979, William Richard Lamberson executed a Last Will and Testament leaving the residuary of his estate to his relatives including the Petitioner, Dr. Harold Lamberson, Jr.
2. On January 23, 1980, William Richard Lamberson executed a Last Will and Testament naming Mary Schwartz as ultimate beneficiary and personal representative of his estate.
3. In January, 1980, William Richard Lamberson was 89 years old, chronically ill, lived alone with his elderly wife, and was unable to care for himself and his wife without assistance.
4. In December, 1979, Hazel Bulla who had been assisting the Lambersons in their day-to-day needs became ill and was unable to continue to provide assistance.
5. In January, 1980, Mary Schwartz, who had no history of a relationship with the Lambersons other than having met *360 the Lambersons during her employment in the office of the Lambersons’ podiatrist, offered to assist the Lambersons. Although she continued her full-time employment at the podiatrist’s office, she persuaded William Lamberson to execute an agreement drafted by her whereby she would receive $1,500 a month compensation for her assistance. In addition, she received their power of attorney to transact financial affairs for them and held herself out as their guardian.
6. During the middle of January, 1980, Mary Schwartz recommended her attorney to draw up a Will for the decedent. She personally gave the attorney the instructions for preparing the Will, secured her friends to witness the Will, had the Will executed in her presence, and maintained possession of the Will before, during and after its execution.
7. The following month both Mr. Lamberson and his wife died.
8. The testimony of the decedent’s family physician, Dr. Culpepper, and the testimony of Dr. Allen, who attended the decedent during the decedent’s hospitalization in January, 1980, and the testimony of Dr. Harold Lamberson, Jr. establishes that the decedent lacked testamentary capacity during January, 1980.
9. The testimony of Mrs. Mary Starr, Mr. Ernest Bentley and Mrs. Hazel Bulla, long-time friends of the decedent, described inappropriate and bizarre behavior by the decedent during the last months of his life. In addition, their testimony established an abrupt change of the decedent’s longtime and often expressed testamentary desires regarding both the distribution of his estate and his desire for burial rather than cremation.
10. The evidence further established that upon discovering the Lambersons’ predicament of having no one to take care of them after Hazel Bulla became ill, Mary Schwartz failed to notify or inform the relatives of the Lambersons’ plight, and, subsequent to moving the Lamber-sons to her residence, failed to notify the Lambersons’ friends of their new address even though said address was requested by the friends.
CONCLUSIONS OF LAW
1. During January 1980, Mary Schwartz occupied a confidential fiduciary relationship with the decedent, William Richard Lamberson.
2. During January, 1980, Mary Schwartz was active in the procurement of the contested January, 1980 Will.
3. During January, 1980, Mary Schwartz exercised improper and indue [sic] influence upon the decedent in the procurement of the Will.’
4. During January, 1980, the decedent, William Richard Lamberson, lacked testamentary capacity.
It is, therefore,
ORDERED AND ADJUDGED that the Petition to revoke the probate of the Will of William Richard Lamberson dated January 23, 1980 is granted and the probate of said Will be and the same is revoked.
I. TESTAMENTARY CAPACITY
On the issue of testamentary capacity, there was a good deal of medical testimony concerning the 89 year-old decedent’s physical condition during the last years of his life. Dr. Culpepper, his family physician, had treated decedent for several years. Decedent suffered from arteriosclerosis and his mental state was “unreliable” during the last years of his life,[1] and had deteriorated further during the last few months prior to his death in February, 1980. Dr. Culpepper last saw decedent on January 17, 1980, one week before the will in question was signed. In his opinion, decedent did *361 not have the mentality to make decisions on how to dispose of his property, and did not have the mental capacity to make a will in January, 1980, notwithstanding the possibility of some lucid intervals.
Dr. Allen, a specialist in internal medicine, treated decedent during a hospitalization from January 28,1980, through February 5, 1980. Dr. Allen stated his opinion that at the time of hospitalization, decedent was suffering from arteriosclerosis and chronic brain syndrome, was incapable of making a will and that the same mental condition had probably existed on January 23, 1980.
Three friends of decedent all testified that a provision in decedent’s January 23, 1980 will requesting cremation was a radical and uncharacteristic departure from his lifelong plan to be buried in New York in a Catholic ceremony. Mrs. Starr and Mrs. Bulla testified that decedent had expressed his desire on many occasions to leave everything he had to his family. Mrs. Starr stated that decedent would sometimes get lost going across the street to the store and on one or two occasions had called to ask her whether it was daytime or nighttime. Mrs. Bulla testified that decedent sometimes did not recognize her; that he thought he had moved when he hadn’t, and that he was extremely paranoid. Mr. Bentley also testified to occasions when decedent would go to the store and get lost on his way home.
Opposed to this evidence was the testimony of the persons who witnessed the execution of the will in appellee’s home. They were friends of appellee and had not known decedent prior to the time the will was signed. Their opinions that decedent seemed alert and stable when appellant read the will to him and that he seemed to understand it were based on that single contact with him. Appellant testified that when the will was executed on January 23, 1980, decedent was particularly alert. She stated that he had twice taken his car to the garage that day for repairs. However, she also related an incident during January or February, 1980, when decedent got up in the middle of the night and turned on all of the stove burners, almost causing a fire, and that there were times when he failed to recognize her. She stated that after January 23,1980, he conducted no more business on his own, and she did it for him.
Appellant’s contention that the trial court misconstrued the legal effect of the evidence is based on the proposition that testamentary capacity to make a will has reference to the condition of the testator at the time the will is executed, and even if made by one insane the will is valid if made during a lucid interval. In re Carnegie’s Estate, 153 Fla. 7, 13 So.2d 299 (Fla.1943). However, the factual circumstances in Carnegie are far different than those here.
We believe the rule of law applicable to this case was stated in In re Estate of Zimmerman, 84 So.2d 560 (Fla.1956), where the court said:
A study of the pertinent cases reveals that the precise condition of the testator’s mental health at the time he executed his will may be established in more ways than one. It may be established by direct proof as to its condition when the will was executed or it may be established by inferences from proof of his mental condition leading up to and following the execution of the will when such proof is properly related and connected. The evidence shows that the testator was afflict ed with arteriosclerosis, a progressive disease of the arteries which seriously affects and may ultimately dethrone the reason, judgment and power of the victim to bear in mind the status of his property or those who would be the natural subjects of his bounty. The evidence here shows that sometime in 1947 or 1948 the testator was in a serious condition as a result of this affliction. What the condition of his mental health was when he executed his will and codicil in 1949 was the immediate problem confront the probate court. “Before hand” and “afterward” proof of the testator’s mental behavior would certainly be a lead to this and would be proper for the court to consider in making up his judgment as to *362 whether or not the will was made during a lucid interval as appellants contend or whether it was made when the mind was incompetent to do so.
Id. at 562. See also In re Estate of Weihe, 275 So.2d 244 (Fla.1973) (where Zimmerman was approved and where the Supreme Court held that the “beforehand” and “afterward” proof of mental condition was sufficient evidence to raise a conflict with testimony of mental condition at the precise time of executing the will, such conflict to be resolved by the trier of fact).
When considered with the fact that the disposition of decedent’s entire estate to a person he had known for only a few weeks was an unnatural disposition, the “before” and “after” evidence of the testator’s mental condition was sufficient to sustain the trial court’s conclusion that decedent lacked testamentary capacity when the will in question was executed.
II. THE CONFIDENTIAL RELATIONSHIP
If a substantial beneficiary under a will occupies a confidential relationship with the testator and is active in the procurement of the contested will, the presumption of undue influence arises. In re Estate of Carpenter, 253 So.2d 697 (Fla. 1971); Allen v. Estate of Dutton, 394 So.2d 132 (Fla.5th DCA 1980).
In Carpenter, the Supreme Court reviewed and summarized circumstances which could be considered in determining whether active procurement existed: (a) presence of the beneficiary at the execution of the will; (b) presence of the beneficiary on those occasions when the testator expressed a desire to make a will; (c) recommendation by the beneficiary of an attorney to draw the will; (d) knowledge of the contents of the will by the beneficiary prior to execution; (e) giving of instructions on preparation of the will by the beneficiary to the attorney drawing the will; (f) securing of witnesses to the will by the beneficiary; and (g) safekeeping of the will by the beneficiary subsequent to execution.
When a reasonable explanation of the proponent’s participation has been given, the presumption disappears, but
since the facts giving rise to the presumption are themselves evidence of undue influence, those facts will remain in the case and will support a permissible inference of undue influence, depending on the credibility and weight assigned by the trial judge to the rebuttal testimony. Carpenter, 253 So.2d at 704.
Appellant quotes the trial judge’s stater ment that “also, I think that there was evidence or certainly the presumption would arise of undue influence and I don’t believe it was dispensed with by a reasonable account of the circumstances,” as meaning that the trial judge decided the issue of undue influence under the mistaken belief that the presumption still existed and had not been rebutted by appellant’s explanation, and that he was, therefore, required to make a finding of undue influence as a matter of law.
The sufficiency or reasonableness of the explanation to rebut the presumption is for the trial judge to determine. Carpenter. However, we do not find in the trial judge’s remark an indication that he was relying on the presumption for his determination. The evidence was clear and strong; the confidential relationship was conceded. Each of the Carpenter criteria for active procurement was present in this case. It is clear that the appellant’s explanation that decedent wanted her to have his estate because she was caring for him in his last days did not satisfy the trial judge, particularly when coupled with the evidence of the testator’s diminished mental capacity which is also a factor the trial court could consider along with the other evidence to determine if undue influence existed.
The undue influence required to invalidate a will is conduct which amounts to overpersuasion, duress, force, coercion, or artful or fraudulent contrivances to such a degree that there is destruction of the free agency and willpower of the one making the will. In re: Carpenter’s Estate, 289 So.2d 410, 411 (Fla.4th DCA 1970). Cer *363 tainly, in light of the evidence outlined here, plus further evidence and factual findings by the trial court that appellant moved decedent into her home, failed to notify his family, refused to notify his friends of his whereabouts, and never told decedent of his wife’s death two weeks before his own, there was sufficient competent evidence to sustain the trial court’s finding that appellant procured the execution of the January 23,1980, will by undue influence.
The final judgment is AFFIRMED.
DAUKSCH, C.J., and FRANK D. UP-CHURCH, Jr., J., concur.

. In testifying about Mrs. Lamberson’s condition, the physician described her also as “unreliable,” which he defined as: “[you] couldn’t communicate with her. You couldn’t give her specific directions because she wouldn’t remember them long enough to carry them out. She talked about unimportant, nonessential, nonsensical things, very flighty. She would talk about things that were unrelated to the subject matter.” The doctor then ascribed this definition to Mr. Lamberson’s condition as well.